1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

L.K.M., et al.,

                    Plaintiffs,

         v.

BETHEL SCHOOL DISTRICT, et al.,

                    Defendants.

CASE NO. C18-5345 BHS

GRANTING IN PART, DENYING
IN PART, AND RESERVING
RULING IN PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

13

14

15

16

17

18

         This matter comes before the Court on the motion for summary judgment of

Defendants Bethel School District ("the District"), Thomas Siegel, Robert Maxwell,

Megan Nelson, Clifford Anderson, Tom Gifford, and Heidi Miller (collectively

"Defendants"). Dkt. 39. The Court has considered the pleadings filed in support of and in

opposition to the motion and the remainder of the file and hereby grants in part, denies in

part, and reserves ruling in part the motion for the reasons stated herein.

19

## I.   PROCEDURAL HISTORY

20

21

22

         On April 27, 2018, Plaintiffs L.K.M., individually and on behalf of her daughter

C.K.M., and J.M. (collectively "Plaintiffs") filed suit against Defendants in the Superior

Court of the State of Washington for Pierce County. Dkt. 1-2. On May 2, 2018, Defendants removed the case to this Court. Dkts. 1, 2.

On July 17, 2020, Defendants filed an amended motion for summary judgment. Dkt. 39. On August 24, 2020, Plaintiffs responded. Dkt. 42. On September 4, 2020, Defendants replied. Dkt. 46.

## II.    FACTUAL BACKGROUND

C.K.M. is intellectually disabled and was enrolled as a special education student in the District at Bethel High School. Dkt 1-2, ¶ 3.1. Her mother, L.K.M., and father, J.M., bring suit against Defendants individually and on behalf of C.K.M. Plaintiffs allege that C.K.M. was sexually assaulted and harassed by another special education student ("David M.") during the 2012–2013 school year. *Id.* ¶¶ 3.5, 3.17. Plaintiffs assert that Defendants knew that David M. had an extensive history of sexual assaults against other special needs students and that Defendants failed to protect C.K.M. from the known risk of harm. *Id.* ¶ 3.31.

**A.    David M. and the District**

Plaintiffs contend that David M. has a history of sexual harassment and assault and that his history was known to the District. Plaintiffs assert that David M. was expelled from the Clover Park School District ("Clover Park") because of repeated incidents of sexual assault. On October 20, 2010, when left unattended and without supervision, David M. was caught masturbating another developmentally disabled student in a bathroom at his middle school. Dkt. 43, Exs. 6 & 7, at 70–74. David M. then raped another young special needs girl in a different bathroom at his middle school when he

was again left without supervision on January 28, 2011. *Id.*, Ex. 8, at 75–94. Plaintiffs assert that following the rape, David M. was transferred to another middle school. Then, on May 16, 2011, David M. was caught sexually molesting a three-year-old child at a Clover Park elementary school playground near his home. *Id.*, Ex. 9, at 95–105. David M. sexually assaulted another special needs student at his new middle school in the bathroom when David M. was left unsupervised on September 14, 2011. *Id.*, Exs. 10 & 11, at 106–13.

Following the September 2011 sexual assault at his middle school, David M. was expelled by Clover Park. *Id.*, Ex. 11, at 112–13. Plaintiffs contend that, before the expulsion could be processed, David M.'s mother withdrew him from Clover Park and transferred him to the District. *Id.*, Ex. 12, at 114–15. Clover Park faxed David M.'s school records to the District on November 11, 2011, which included two "Manifestation Determinations" documenting David M.'s history of sexual assault while at Clover Park. *Id.*, Exs. 13 & 14, at 116–22.

The District's special education department, Special Services, put together an Evaluation Summary for David M. based upon his past test records, his Individualized Education Plan ("IEP"), and his disciplinary records, including the Manifestation Determinations. *Id.*, Ex. 15, at 123–27. The Evaluation Summary documented that David M. had been involved in inappropriate sexual conduct and that he needed to be closely watched because of these past incidents. *Id.* Special Services then created an IEP for David M., *id.*, Ex. 16, at 128–68, which noted that David M. was working on appropriate sexual boundaries, *id.* at 134. The IEP stated that David M. was to have a one-on-one

1    paraeducator due to his past sexual misconduct and that he "is not able to go to the

2    bathroom without letting an adult know and he is not to be left alone with peers

3    unsupervised (i.e. locker room)." *Id.* at 146–47.

4         Plaintiffs further assert that the District received verbal warnings about David M.'s

5    dangerousness from attorney Williams Coats ("Coats"), general counsel to both the

6    District and Clover Park. Plaintiffs provide a letter from Defendants' counsel, Michael

7    Patterson, which states that Coats "represented [Clover Park] in the two prior cases

8    involving [David M.] and he personally spoke with the Bethel School District to provide

9    background information about [David M.]." *Id.*, Ex. 17, at 171. Plaintiffs further provide

10   the deposition of Defendant Thomas Siegel, the District's Superintendent, who testified

11   that he assumed that he met with Coats to discuss David M. *Id.*, Ex. 18, at 174. Plaintiffs

12   also provide the deposition of Defendants' school expert, Janet Barry, who testified that

13   Coats met with Defendant Robert Maxwell ("Maxwell"), the District's Executive

14   Director of Special Services, and relayed to Maxwell that Clover Park advised one-on-

15   one supervision for David M. *Id.*, Ex. 19, at 179. Defendants refute that Coats provided

16   the District with any additional information about David M. that was not already included

17   in the documents from Clover Park. Dkt. 46 at 3.

18        Plaintiffs finally assert that the District improperly removed David M. from one-

19   on-one supervision in violation of his IEP. David M.'s IEP required him to have a one-

20   on-one paraeducator with him at all times to ensure that David M.'s interactions with his

21   peers were appropriate and safe. Dkt. 43, Ex. 21, at 188. During his first year in the

22   District (i.e., the 2011–2012 school year), David M. was assigned a one-on-one

paraeducator and did not have any sexually aggressive episodes. *Id.*, Ex. 22, Deposition of Sharon Dye, at 191. However, when David M. moved from junior high to Bethel High School, the District and Defendants removed his one-on-one paraeducator in violation of his IEP. *See id.*, Ex. 23, Deposition of Megan Nelson, at 195. Defendant Megan Nelson ("Nelson") testified in her deposition that the IEP team, consisting of Nelson, David M.'s teacher, and the District's administration, decided to remove David M.'s one-on-one supervision. *Id.* at 197. Nelson further testified that the decision to remove the one-on-one paraeducator was never memorialized in the IEP and that she did not know whether David M.'s parents were notified that the supervision was to be removed. *Id.* Lori Haugen ("Haugen"), the District's Director of Special Services, additionally testified in her deposition that removing David M.'s one-on-one supervision without having a meeting or having documentation was a violation of the standard of care for David M.'s IEP. *Id.*, Ex. 1, Deposition of Lori Haugen, at 43. Defendants contend that David M.'s supervision was modified from one-on-one to line-of-sight supervision for the 2012–2013 school year at Bethel High School. Dkt. 46 at 4.

**B.    David M.'s Alleged Sexual Harassment and Assault of C.K.M.**

**1.    Before the October 5, 2012 Incident**

During the 2012–2013 school year, Plaintiff C.K.M. and David M. were freshman in Bethel High School's special education classroom, the Independent Learning Center ("ILC"), taught by Defendant Heidi Miller ("Miller"). Plaintiffs provide a logbook kept by ILC teachers and staff to document David M.'s actions, which includes four logs of interactions between David M. and C.K.M prior to October 5, 2012. *See* Dkt. 43, Ex. 3. at

35–36. The instances include: David M. and C.K.M. attempting to hold hands on the way to the bus; David M. trying to kiss C.K.M. behind a bookshelf; C.K.M. trying to remove her shirt during class, and then David M. sitting next to C.K.M. and touching leg-to-leg; and David M. and C.K.M. being redirected several times because they were too close together. *See id.* Plaintiffs argue that the log shows David M.'s sexual predatory nature and an increase in sexualized behavior by C.K.M. subsequent to David M.'s harassment. Defendants contend that the log shows that David M. was closely monitored and that David M. exhibited behaviors consistent with his disability.

Plaintiffs also assert that David M. sexually assaulted C.K.M. prior to October 5 and that L.K.M. learned of the abuse from Bethel High School employees. *Id.*, Ex. 27 ("Decl. of L.K.M."), at ¶ 4. L.K.M. declares that Bethel High School told her that they sent C.K.M. out of the classroom with David M. to dispose of their lunch garbage. *Id.* David M. allegedly came back without C.K.M. approximately three to five minutes later, and teachers found C.K.M. sitting behind a garbage can crying. *Id.* L.K.M. further declares that she was told by Bethel High School employees that C.K.M. was holding her breasts while saying David M. had touched her. *Id.* The school employees allegedly told L.K.M. that C.K.M. was too sexual toward David M., and L.K.M. declares that C.K.M. disclosed that night that David M. had touched her breasts. *Id.*

In her deposition, Miller testified that she did not recall any such incident. Dkt. 40-5, Deposition of Heidi Miller ("Miller Depo."), at 48:22–49:7. Paraeducators Shari Barker ("Barker") and Sharon Dye declare that the incident between C.K.M. and David M. described by L.K.M. never happened. Dkt 40-3, ¶7; Dkt. 40-4, ¶ 7. They both declare

that they would have never allowed C.K.M. and David M. to leave their line of sight

knowing what they knew about the two students. Dkt 40-3, ¶7; Dkt. 40-4, ¶ 7.

### 2.     October 5, 2012 Incident

Plaintiffs assert that David M.'s actions toward C.K.M. culminated on October 5,

2012 when David M. sexually assaulted C.K.M. during a physical education period after

being left unattended. *See*, Dkt. 43, Ex. 25, at 204. On October 5, 2012, there were about

thirteen ILC students taking part in physical education, including David M. and C.K.M.,

who were supervised by paraeducator Barker, a substitute paraeducator Rebecca

Cromwell ("Cromwell"), and a TA named Stephanie. Dkt. 40-6, Deposition of Shari

Barker ("Barker Depo."), at 98:7–18. Barker testified that all of the students were

walking around the track except for David M., who was playing football in the center of

the track. *Id.* at 104:6–16. Barker testified that she was walking with Stephanie around

the track and C.K.M. was approximately ten feet in front of her. *Id.* at 105:3–5. Cromwell

then ran up to Barker with a concern about another ILC student who Cromwell saw near

a gate by the main road. *Id.* at 113:18–21, 115:1–5. Barker told Cromwell that the

student's behavior was normal and that he was not "a runner." *Id.* at 116:11–13. Barker

testified that this conversation lasted only "a few seconds" and that, when she turned

away from the conversation with Cromwell, she did not see C.K.M. *Id.* at 117:11–25.

Barker testified that she first turned to the middle of the track to see if C.K.M. was

there, but Barker did not see C.K.M. or David M. *Id.* at 119:19–25. Though she did not

see David M., Barker stated that she did not assume that C.K.M. and David M. were

together. *Id.* at 130:6–10. Barker and Stephanie then "took off running" searching for

1  C.K.M. and headed towards the portable toilet because Barker thought it was the only

2  place to hide. *Id.* at 119:4–6, 123:18–23. Barker testified that it took her approximately

3  30 seconds to reach the portable toilet and she then started pounding on the locked door.

4  *Id.* at 138:7–11, 139:8–15. Barker testified that she heard two individuals laughing inside

5  and yelled at them to open the door. *Id.* at 139:14–18. She further stated that it took a

6  maximum of 10 seconds for the individuals to open the door. *Id.* at 144:4–13. When

7  Barker opened the door, David M. and C.K.M. were inside, and she testified that C.K.M.

8  said "We weren't doing anything" and was laughing hysterically. *Id.* at 145:3–14.

9  Barker testified that she then separated David M. and C.K.M. and that Stephanie

10  brought C.K.M. back to the classroom. *Id.* at 153:10–12. Barker stated that David M.

11  kept saying nothing happened and he and C.K.M. were not doing anything. *Id.* at 153:12–

12  17. Miller spoke with C.K.M. in the classroom and testified: "I don't know that [C.K.M.]

13  really gave me any information about what happened. She didn't seem concerned or, you

14  know, that she thought that there was anything wrong with it." Miller Depo. at 63:20–25.

15  Barker then prepared a Student Accident/Injury Report ("the Report"). The Report

16  states that David M. had "veered off football field as we were focused on another student

17  and snuck into portable toilets by bleachers." *See*, Dkt. 43, Ex. 25, at 204. The Report

18  also states that David M. had "inappropriate behavior" inside the locked portable toilet

19  with C.K.M. *Id.* The Vice Principal of Bethel High School, Defendant Tom Gifford

20  ("Gifford"), then expelled both David M. and C.K.M. for "vulgar or lewd conduct"

21  because of the October 5 incident. *See id.*, Ex. 26, at 207. Gifford explained that the

22

1   emergency expulsion was not a disciplinary issue but rather an intervention technique.

2   *See* Dkt. 40-9, Deposition of Tom Gifford.

3        L.K.M. then had a meeting with representatives from Bethel High School about

4   the October 5 incident. Decl. of L.K.M., ¶ 5. School officials and employees told L.K.M.

5   that C.K.M. allegedly "snuck" into a portable toilet with David M. *Id.* L.K.M declares

6   that she questioned how that was possible because C.K.M. had required line-of-sight

7   supervision or alternatively C.K.M. was to wear an orange vest for visibility purposes. *Id.*

8   L.K.M. further declares that she was told by Bethel High School that they did not know

9   how long C.K.M. and David M. were in the portable toilet together. *Id.*, ¶ 6. She also

10   states that Gifford asserted that C.K.M. and David M. were "caught" after only a minute

11   or so and that nothing bad could have happened because of the short amount of time they

12   were alone. *Id.*

13        L.K.M. declares that, following the meeting with Bethel High School, she asked

14   C.K.M. what happened with David M. and that, in response, C.K.M. pulled down her

15   pants and said David M. put his fingers "in here," as she was pointing to her vagina. *Id.*,

16   ¶ 8. L.K.M. declares that C.K.M. then pulled up her shirt and said David M. had licked

17   her breasts. *Id.*

18   **3.    After the October 5, 2012 Incident**

19        Following the October 5, 2012 incident, Plaintiffs contend that the District

20   continued to allow David M. to prey on C.K.M. and other ILC children. Plaintiffs again

21   provide the logbook, which documents approximately twenty-one incidents of David M.

22   allegedly sexual harassing C.K.M. *See* Dkt. 43, Ex. 3. at 36–60. Plaintiffs assert that the

1  log of David M.'s behavior was kept by the ILC teachers and paraeducators and was

2  shared with Gifford, Haugen, and Nelson.

3      Plaintiffs further contend that David M.'s actions violated the District's sexual

4  harassment policy ("the Policy") but that the Policy was not enforced because C.K.M.

5  never objected to David M.'s harassment as "unwanted." The Policy defines "student to

6  student" harassment as:

7      For the purpose of this policy, student to student sexual harassment is
       defined as any unwanted sexual behavior, such as sexually explicit gestures
8      with hands or through body movements, sexual teasing or jokes, pressure
       for dates, sexually demeaning comments, deliberate touching or pinching,
9      cornering or blocking a student's movement, pulling at clothing, attempts to
       fondle or kiss, pressure for sex or any other conduct designed to embarrass
10     or to intimidate whenever such harassment occurs on school property....
       (Sexual assault and/or rape is also a form of sexual harassment and is a
11     criminal act that will be reported to law enforcement immediately for
       investigation and possible prosecution.)

12  *Id.*, Ex. 28, at 214. In his deposition, Gifford testified that David M.'s actions towards

13  C.K.M. were not sexual harassment but inappropriate behavior because C.K.M. did not

14  object to what was going on. *Id.*, Ex. 5, Deposition of Tom Gifford, at 24:2–20. The

15  District's expert, Janet Barry, also concluded that, because of David M.'s age and

16  cognitive ability and because C.K.M. could not object, she does not consider David M.'s

17  actions to fit within the definition of sexual harassment. *Id.*, Ex. 19, Deposition of Janet

18  Barry, at 49:12–50:5. Plaintiffs' expert witness, Judith Billings, opines that C.K.M. was

19  unable to object to David M.'s sexual harassment because of her disabilities but that

20  David M.'s actions still constituted sexual harassment. *Id.*, Ex. 29, ¶ 16.

21

22

# III.   DISCUSSION

Defendants move for summary judgment on all of Plaintiffs' claims—negligence, violation of Washington's Law Against Discrimination ("WLAD"), violation of the Fourteenth Amendment's Due Process clause, and violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX")—arguing that they are entitled to judgment as a matter of law.

## A.    Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

1   The determination of the existence of a material fact is often a close question. The

2   Court must consider the substantive evidentiary burden that the nonmoving party must

3   meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

4   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

5   issues of controversy in favor of the nonmoving party only when the facts specifically

6   attested by that party contradict facts specifically attested by the moving party. The

7   nonmoving party may not merely state that it will discredit the moving party's evidence

8   at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

9   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

10  nonspecific statements in affidavits are not sufficient, and missing facts will not be

11  presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

12  **A.   42 U.S.C. § 1983 Claim**

13  Defendants argue that they are entitled to summary judgment on Plaintiffs' § 1983

14  claims, advancing two grounds for the dismissal of those claims. First, Defendants

15  Thomas Siegel, Robert Maxwell, Megan Nelson, Clifford Anderson, Tom Gifford, and

16  Heidi Miller ("individual Defendants") argue that they are entitled to qualified immunity

17  of Plaintiffs' § 1983 claim because C.K.M.'s constitutional substantive due process rights

18  were not clearly established. Additionally, the District argues that Plaintiffs cannot satisfy

19  the legal standard set forth in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), to

20  show that it is liable for the alleged constitutional violations committed by its employees.

21

22

1          **1.     Qualified Immunity**

2          The individual Defendants argue that they are entitled to qualified immunity on

3   Plaintiffs' § 1983 claims for the alleged substantive due process violations. "Government

4   officials performing discretionary functions enjoy qualified immunity from civil damages

5   so long as their conduct does not violate 'clearly established statutory or constitutional

6   rights of which a reasonable person would have known.'" *F.E. Trotter, Inc. v. Watkins*,

7   869 F.2d 1312, 1314 (9th Cir. 1989) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

8   (1982)). In analyzing a qualified immunity defense, the Court must determine: (1)

9   whether a constitutional right would have been violated on the facts alleged, taken in the

10  light most favorable to the party asserting the injury; and (2) whether the right was

11  clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 533

12  U.S. 194, 201 (2001). "The relevant dispositive inquiry in determining whether a right is

13  clearly established is whether it would be clear to a reasonable officer that his conduct

14  was unlawful in the situation he confronted." *Id.* at 202. In analyzing a qualified

15  immunity defense, courts are "permitted to exercise sound discretion in deciding which

16  of the two prongs of the qualified immunity analysis should be addressed first in light of

17  the circumstances in the particular case at hand." *Pearson v. Callahan*, 55 U.S. 223, 236

18  (2009). Here, the Court will first determine whether C.K.M.'s constitutional rights were

19  violated and then determine whether her rights were clearly established under the relevant

20  circumstances.

21         The due process rights secured by the Fourteenth Amendment include "the right to

22  be free from state-imposed violations of bodily integrity[,]" and it is well-established that

sexual abuse violates that right. *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). To support their argument that the individual Defendants violated C.K.M.'s constitutional rights under the Fourteenth Amendment, Plaintiffs assert two theories: first, that the individual Defendants made a state-created danger and, second, that the individual Defendants failed to report known sexual abuse.

### a. Constitutional Violation: State-Created Danger

Plaintiffs assert that C.K.M.'s substantive due process rights were violated by sexual abuse perpetrated by David M.—a third party—but "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Serv.*, 489 U.S. 189, 197 (1989). Under the *DeShaney* rule, a defendant does not have § 1983 liability for constitutional violations inflicted by a private actor unless a plaintiff can establish that the abuse grew out of a "state-created danger" or the government defendant had a "special relationship" with the plaintiff. *See Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007). Here, Plaintiffs argue the "state-created danger" exception. The Ninth Circuit's "'state-created danger' cases . . . contemplate § 1983 liability for the state actor who, though not inflicting plaintiff's injury himself, has placed plaintiff in the harmful path of a third party not liable under § 1983." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1082 (9th Cir. 2006). This exception applies only where (1) there is "affirmative conduct on the part of the [defendant] in placing the plaintiff in danger" and (2) the defendant "acts with 'deliberate indifference' to a 'known or obvious danger.'" *Patel v. Kent Sch. Dist.*,

648 F.3d 965, 974 (9th Cir. 2011) (quoting *Munger v. City of Glasgow Police Dep't*, 227

F.3d 1082, 1086 (9th Cir. 2000); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

In *Johnson*, the Ninth Circuit examined cases where it had previously recognized

affirmative acts that implicated the danger-creation exception. 474 F.3d 634. Examining

those cases, the Ninth Circuit noted that it had only found affirmative state actions when

(1) there was "involuntary exposure to harm, as a result of a state actor's command," (2)

"the state actor exposed the plaintiff to a danger which she otherwise would not have

faced," or (3) state actors "confine[d] the . . . Plaintiffs to a place where they would be

exposed to a risk of harm by private persons." *Id.* at 640–41. Here, Plaintiffs argue that

the individual Defendants exposed C.K.M. to a danger she otherwise would not have

faced "by placing a known sexually assaultive student, David M., in a special needs

classroom without a one-on-one paraeducator supervisor in violation of David's IEP."

Dkt. 42 at 24. The "affirmative conduct" sufficient for a "state-created danger" claim

requires an action that "affirmatively place[s] the plaintiff in a position of danger." *Wood

v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir. 1989) (internal quotation marks removed).

The question of affirmative conduct is often a close call, and the District of Arizona has

well summarized how the issue has been decided in the Ninth Circuit.

> This requirement is perhaps best understood in light of the cases
> finding the necessary conduct. These cases uniformly involve a government
> official who takes a specific action that places specific persons in a position
> of relatively less safety than they enjoyed before the affirmative act. *See
> Kennedy*, 439 F.3d at 1055 (mother reporting a crime against her daughter
> fears retaliation from the alleged perpetrator and therefore asks police
> officer not to contact the alleged perpetrator about the crime without first
> warning her; police officer disregards this instruction and contacts the
> perpetrator, but then tells mother that he would put extra patrols in place;

police officer does not do so; alleged perpetrator breaks into mother's house that night, killing her husband and wounding her); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir. 2000) (on a very cold night, police officers eject a drunk patron from a bar but warn him not to drive his vehicle; patron is wearing only jeans and a t-shirt and dies of exposure); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir.1997) (police encounter a man on the porch of his home displaying serious medical symptoms but cancel a 911 call already placed by his neighbors, bring him into his house, and leave him there alone, where he dies); *L.W.*, 974 F.2d at 121 (prison officers affirmatively assign an inmate with a known and "extraordinary history of unrepentant violence against women and girls" to work, unsupervised, with a female nurse working in the prison's clinic; inmate rapes nurse); *Wood*, 879 F.2d at 583 (police arrest the driver of a car, impound the car, and leave a female passenger in the car stranded in a high-crime neighborhood; passenger is eventually raped); *Ayala v. Mohave Cnty.*, No. CV–07–8105–PHX–NVW, 2008 WL 4849963 (D.Ariz. Nov. 7, 2008) (police arrest a driver, impound the vehicle, and require the drunk passenger, wearing dark clothing, to leave the scene—a dark highway—on foot; passenger is later struck by a passing vehicle and killed).

By contrast, there is no "affirmative act" when a government official allows a dangerous situation to develop or continue without intervention—even if the official affirmatively chooses not to intervene. These cases rest on *DeShaney*'s insistence that a "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. at 197, 109 S. Ct. 998. If a plaintiff's § 1983 claim would effectively impose a contrary requirement, it fails. *See Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007) (police adopt an interventionist riot control plan one day, but then choose a passive plan the next day, allowing mass violence to continue in a contained area; plaintiffs are injured by that violence, but police not liable under § 1983); *O'Dell v. Casa Grande Elem. Sch. Dist. No. 4*, No. CV–08–0240–PHX–GMS, 2008 WL 5215329 (D.Ariz. Dec. 12, 2008) (school officials are aware of one student's threats to assault another student, but take no action to keep those students apart; assault happens as threatened, but school officials not liable under § 1983).

*Doe v. Round Valley Uni. Sch. Dist.*, 873 F. Supp. 2d 1124, 1132–33 (D. Ariz. 2012).

Plaintiffs argue that the required affirmative step occurred when David M. was removed from one-on-one supervision in violation of his IEP. The individual Defendants

misconstrue Plaintiffs' argument to mean that the District's staff failed to intervene and prevent David M. from harming C.K.M.; the Defendants are correct that failing to take action or allowing a dangerous situation to develop does not constitute affirmative action. The decision to remove David M. from one-on-one supervision knowing his history of sexual abuse and his IEP was an affirmative act by the Defendants, much like in *L.W.* when the state employees affirmatively assigned an inmate with a known history of sexual violence towards women to a shift with a female registered nurse, 974 F.2d at 121. The alleged constitutional violation is not based on the *inaction* of the individual Defendants in allowing David M. to harass C.K.M. but is rather based on the affirmative decision to remove David M. from one-on-one supervision which exposed C.K.M. to a danger she would not have otherwise faced.

Here, Defendant Nelson testified in her deposition that it was both an IEP team decision and her recommendation to remove David M. from one-on-one paraeducator supervision. Dkt. 43, Ex. 23, Deposition of Megan Nelson, at 197. It is unclear from the record provided whether any other of the individual Defendants participated in removing David M. from one-on-one supervision. Therefore, the Court finds that Nelson affirmatively acted when she recommended David M. be removed from one-on-one supervision, contrary to his IEP, and that this act placed C.K.M. in a position of danger.

But affirmative action by itself is insufficient to establish a constitutional violation. Under *DeShaney*, the defendant must also act with deliberate indifference to a known or obvious danger. Nelson testified that she was aware that David M. was placed on one-on-one supervision because of his history of sexual assault. *Id.* at 198. Plaintiffs

1  therefore argue that Nelson acted with deliberate disregard to the danger created by

2  David M. A constitutional violation may exist with respect to Defendant Nelson because,

3  taking the evidence in the light most favorable to Plaintiffs, a reasonable juror could

4  conclude that Nelson affirmatively acted in creating a more dangerous situation for

5  C.K.M and that she acted with deliberate disregard to David M.'s known history of

6  sexual assault.

7      Moreover, "[a] supervisor may be liable [under § 1983] if there exists either (1)

8  his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal

9  connection between the supervisor's wrongful conduct and the constitutional violation."

10  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). *See also Starr v. Baca*, 652 F.3d

11  1202, 1208 (9th Cir. 2011) (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th

12  Cir. 2005)) ("We have held that 'acquiescence or culpable indifference' may suffice to

13  show that a supervisor 'personally played a role in the alleged constitutional

14  violations.'"). While Nelson testified that it was her expectation that Defendant Maxwell

15  would have told her about David M.'s history of sexual abuse, Dkt. 43, Ex. 23,

16  Deposition of Megan Nelson, at 198, the record is incomplete as to whether any of the

17  other individual Defendants engaged in any wrongful conduct, like "acquiescence or

18  culpable indifference," when it was decided to remove David M. from one-on-one

19  supervision. As to the remaining individual Defendants—Thomas Siegel, Robert

20  Maxwell, Clifford Anderson, Tom Gifford, and Heidi Miller—Plaintiffs have failed to

21  either cite or submit evidence to establish that these other defendants engaged in a

22  *DeShaney* constitutional violation.

### b. Constitutional Violation: Failure to Report

The failure to report abuse in conformance with statutory requirements can constitute the execution of an unconstitutional policy, practice, or custom of deliberate indifference towards a child's right to bodily integrity. *See e.g., Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 146 (2d Cir. 1981) (stating that failure to comply with reporting duties is "evidence of an overall posture of deliberate indifference toward [a child]'s welfare."). However, this same precedent indicates that, on its own, a failure to report abuse only constitutes an unconstitutional action if it proximately causes the constitutional deprivation. *Id.* ("[T]he failure to report *was itself a proximate cause of [a] continuing injury* and could be the basis for liability if the agency's failure was the result of its being deliberately unconcerned about whether it complied with that duty, since reporting would have led to an investigation by the Department's confidential investigations unit which might well have discovered the abuse *and put an end to it . . . .*") (emphasis added). Therefore, established law on the nexus between a state's mandatory reporting statutes and any resulting constitutional duties indicates that, on its own, an official's failure to report sexual harassment or abuse can constitute a constitutional violation only if complying with the reporting duties likely could have ended the abuse.

The Court concludes that a failure to comply with reporting requirements does evidence a plausible theory of deliberate indifference towards children's right to bodily integrity. Here, Plaintiffs argue that the individual Defendants acted with an attitude of deliberate indifference towards a known risk to C.K.M.'s safety, i.e., David M, and failed

1    to report David M.'s ongoing abuse to authorities. The evidence provided by Plaintiffs

2    shows that Defendants Gifford and Miller had personal knowledge of the October 5

3    incident when David M. allegedly sexually assaulted C.K.M. in a portable toilet. Miller

4    spoke with C.K.M. on October 5 directly after C.K.M. and David M. were found together

5    in the portable toilet, and Gifford expelled C.K.M. following the incident and attended

6    the meeting with L.K.M. to discuss the October 5 incident. It appears that neither Miller

7    nor Gifford reported the October 5 incident to authorities. And despite this incident,

8    David M. and C.K.M. were allowed to return to the same classroom.

9          Furthermore, Miller and the ILC paraeducators kept a logbook of David M.'s

10   actions and noted many interactions between David M. and C.K.M. before and after the

11   October 5 incident. *See* Dkt. 43, Ex. 3. at 36–60. Plaintiffs argue that these interactions

12   were sexual harassment and that the individual Defendants again failed to report the

13   abuse in accordance with the statutory requirement. The evidence provided shows that

14   Miller documented the interactions between David M. and C.K.M., and Plaintiffs assert

15   that the logbook was shared with Gifford and Nelson. Miller and the ILC paraeducators

16   did not report any of the interactions and continued to "redirect" David M. and C.K.M.

17   throughout the year.

18         Viewing the evidence in the light most favorable to Plaintiffs, a reasonable

19   factfinder could conclude that Defendants Miller and Gifford, despite knowing David

20   M.'s history of sexual assault and personal history with C.K.M., allowed David M. and

21   C.K.M. to be in the same classroom without instituting reasonable measures to abate the

22   immediate risk to C.K.M.'s safety. Generally, an official acts with deliberate indifference

1   if he knows of "a substantial risk of serious harm and disregards that risk *by failing to*

2   *take reasonable measures to abate it.*" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060,

3   1067 (9th Cir. 2016) (quotation marks omitted) (emphasis in original). Similarly, the

4   failure to report the alleged sexual harassment in violation of the statutory mandate

5   creates a question of fact whether complying with the reporting duties likely could have

6   ended the abuse. As to Defendants Miller and Gifford, C.K.M.'s rights to bodily integrity

7   may have been violated by the named Defendants' deliberate indifference to the risk

8   David M. posed to C.K.M. and failure to report the ongoing sexual harassment and

9   danger to C.K.M. Therefore, there is evidence from which a jury could find that

10  Defendants Miller, Gifford, and Nelson violated C.K.M.'s constitutional rights.

11          **c.      Clearly Established**

12          The Court must now determine whether C.K.M.'s rights were clearly established.

13  Clearly established law must be defined with a "high 'degree of specificity,'" *District of*

14  *Columbia v. Wesby*, 136 S. Ct. 577, 590 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13

15  (2015) (per curiam)), and this standard is "demanding," *id.* at 589. Moreover, Plaintiffs

16  bear the burden of demonstrating that the right which Defendants allegedly violated was

17  clearly established at the time of the alleged misconduct. *See Davis v. Scherer*, 468 U.S.

18  183, 197 (1984).

19          Plaintiffs have established that a jury could reasonably find that three of the

20  Individual Defendants violated C.K.M.'s substantive due process rights. They provide

21  precedent to support their argument about whether her constitutional rights were violated

22  but make no argument that the circumstances in the cited cases would put a reasonable

actor on notice based on these particular facts. Rather, Plaintiffs discuss the right to be

free from student-to-student sexual harassment, and the cases they cite to do not support

such a right under the Due Process Clause of the Fourteenth Amendment. Plaintiffs

provide precedent from a Ninth Circuit case and a Northern District of California case.[1]

In *Oona R.-S.- by Kate S. v. McCaffrey*, the Ninth Circuit held that, in the context of Title

IX, "the defendants are not entitled to immunity for their failure to take steps to remedy

the hostile environment created by the male students in Oona's class." 143 F.3d 473, 477

(9th Cir. 1998). The denial of qualified immunity in this case was limited to the

plaintiffs' claim that the school failed to adequately address a known hostile environment

created by peer-to-peer sexual harassment. *Id.* Similarly, though nonbinding precedent,

the Northern District of California held that the law was clearly established under Title

IX to preclude qualified immunity for a school principal who knew or should have known

about peer-to-peer sexual harassment. *Nicole M. By and Through Jacqueline M. v.*

*Martinez Unified Sch. Dist.*, 964 F. Supp. 1369, 1382 (N.D. Cal. 1997).

　　　　Plaintiffs discuss whether the right to be free from peer-to-peer sexual harassment

is clearly established, but the constitutional violations they articulate in briefing arise out

---

[1] The Ninth Circuit makes clear that courts first look to binding precedent to determine whether the law was clearly established. *Chappell v. Madeville*, 706 F.3d 1052, 1056 (9th Cir. 2013); see also *Carrillo v. Cnty. of L.A.*, 798 F.3d 1210, 1221 (9th Cir. 2015) ("clearly established law" includes "controlling authority in [the defendants'] jurisdiction" (alteration in original) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). While the Ninth Circuit has held that unpublished decisions of district courts may inform qualified immunity analysis, *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002), the Ninth Circuit has primarily used district court decisions in conjunction with controlling authority, *see Prison Legal News v. Cook*, 238 F.3d 1145, 1152 (9th Cir. 2001).

1    of the Due Process Clause of the Fourteenth Amendment rather than the Equal Protection

2    Clause. Plaintiffs do cite to precedent that could clearly establish C.K.M.'s rights under

3    the Due Process Clause, however deciding the issue of clearly established law based on

4    the due process precedent could potentially prejudice Defendants because they have not

5    had an opportunity to reply to this particular clearly established argument. Therefore, the

6    Court reserves ruling on the issue of qualified immunity for the Individual Defendants

7    and requests supplemental briefing on whether C.K.M.'s substantive due process rights

8    were clearly established.

9        2.    *Monell* **Liability**

10       The District also moves for summary judgment claiming that Plaintiffs cannot

11   prove the existence of a policy, custom, or practice that was the moving force behind the

12   deprivation of C.K.M.'s constitutional rights. To assert a claim against a municipality

13   under § 1983, a plaintiff must show that the defendant's employees or agents acted

14   pursuant to an official custom, pattern, or policy that violates the plaintiff's civil rights; or

15   that the entity ratified the unlawful conduct. *Monell*, 436 U.S. at 690–91; *Larez v. City of*

16   *Los Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991). It is not enough that the municipality

17   merely employed a tortfeasor. *See Monell*, 436 U.S. at 691.

18       A municipality may be liable for a "policy of inaction" where "such inaction

19   amounts to a failure to protect constitutional rights." *Lee v. City of Los Angeles*, 250 F.3d

20   668, 682 (9th Cir. 2000) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

21   The custom or policy of inaction must constitute deliberate indifference, i.e., it "must be

22   the result of a conscious or deliberate choice to follow a course of action made from

among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 681 (citations and internal punctuation omitted). If inaction was in the form of deficient training, the plaintiff must show that the training deficiency was "closely related to the ultimate injury." *Id.* (quoting *Canton*, 489 U.S. at 391). "In other words, a plaintiff must show that his or her constitutional "injury would have been avoided" had the governmental entity properly trained its employees." *Lee*, 250 F.3d at 681.

Plaintiffs argue that the District's action—mainly, its *inaction*—that resulted in the violation of C.K.M.'s constitutional rights were taken pursuant to official policy and therefore that the District should also be held liable under § 1983. Indeed, the Ninth Circuit has held that "a local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights." *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). Under an inaction theory, a plaintiff must establish: "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989)).

The Court determined above that C.K.M. has sufficiently established that her Fourteenth Amendment Due Process Rights were violated through a state-created action theory or through a deliberate inaction theory. Thus, the initial question is whether the District had a policy. Plaintiffs must demonstrate that the failure to report sexual

harassment or the affirmative action of removing David M. from one-on-one supervision was the result of an official policy—that is, "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion). The District raises for the first time in its reply the issue of who is a policymaker for the District. *See* Dkt. 46 at 6–11. In light of the constitutional violations and the District's new arguments in its reply, it would be inappropriate for the Court to determine *Monell* liability at this juncture. The Court therefore reserves ruling on *Monell* liability for the District and requests supplemental briefing.

**B.    Title IX Claim**

The District next moves for summary judgment on Plaintiffs' Title IX claim, arguing that Plaintiffs cannot show that the District possessed "actual knowledge" of David M.'s sexual harassment and assault of C.K.M. Dkt. 39 at 19–22. The Court finds otherwise.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private right of action for damages under this provision. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999). However, damages are available in such an action only where "an official who at a minimum has authority to address the

1    alleged discrimination and to institute corrective measures on the recipient's behalf has

2    *actual knowledge* of the discrimination in the recipient's programs and fails to adequately

3    respond." *Gebser v. Lago Indep. Sch. Dist.*, 524 U.S. 274, 283 (1998) (emphasis added).

4    "In sexual harassment cases, it is the deliberate failure to curtail *known harassment*,

5    rather than the harassment itself, that constitutes the intentional Title IX violation."

6    *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 967 (9th Cir. 2010)

7    (emphasis added).

8         Frustrating, however, is the Supreme Court's language in *Gebser* stating that a

9    Title IX claim falls short where school officials receive a complaint "that was plainly

10   insufficient to alert [them] *to the possibility* that [an employee] was involved in a sexual

11   relationship with a student." *Gebser*, 524 U.S. at 291 (emphasis added). The use of the

12   term "possibility" creates ambiguity regarding what exactly it is that schools must have

13   "actual knowledge" about. It is important, however, to recognize that the *Gebser* opinion

14   never actually stated that evidence alerting school officials to the *possibility* of sexual

15   abuse would satisfy the "actual knowledge" requirement. Instead, the Supreme Court

16   ruled that the absence of such evidence showed that the "actual knowledge" requirement

17   was not satisfied. Accordingly, the Court sees it as reasonable that the Fourth Circuit, in

18   contrast to the above cited decisions, has rejected a Title IX claim on the basis that,

19   "[a]lthough [a school official] certainly should have been aware of the *potential* for such

20   abuse, and for this reason was properly held liable under § 1983, there is no evidence in

21   the record to support a conclusion that [the official] was *in fact* aware that a student was

22

1   being abused." *Baynard v. Malone*, 268 F.3d 228, 238 (4th Cir. 2001) (emphasis in

2   original).

3        The most recent Supreme Court instruction on the "actual knowledge"

4   requirement was given in *Davis*. In that case, the Supreme Court characterized its *Gebser*

5   opinion as having held that "a recipient of federal education funds may be liable in

6   damages under Title IX where it is deliberately indifferent to known acts of sexual

7   harassment by a teacher." *Id.* at 641. Similar to the Supreme Court's "known acts"

8   language is the Ninth Circuit's explanation that in cases involving sexual abuse, Title IX

9   liability is predicated on the "failure to curtail known harassment, rather than the

10   harassment itself . . . ." *Mansourian*, 602 F.3d at 967. Other than this, the Court is

11   unaware of any further Supreme Court or Ninth Circuit precedent offering guidance in

12   resolving the ambiguity of Title IX's "actual knowledge" requirement as established in

13   *Gebser*.

14        In the Court's own experience applying Title IX, it recently engaged in a similar

15   review of non-binding precedent from other district courts regarding when the issue of

16   "actual knowledge" becomes a genuine disputed fact to be resolved at trial. *J.J. v.*

17   *Olympia Sch. Dist.*, C16-5060 BHS, 2017 WL 347397, *5–*6 (W.D. Wash. Jan. 24,

18   2017). Reviewing two published district court cases in particular, the Court recognized a

19   trending principle that a "triable issue of fact arises [as to actual knowledge] when a

20   school official is confronted with known acts that could objectively be characterized as

21   sexually motivated, but the official does not view those acts as sexual harassment." *Id.* at

22   *6 (citing *Roe ex rel. Callahan v. Gustine Unified Sch. Dist.*, 678 F. Supp. 2d 1008, 1032

(E.D. Cal. 2009); *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 211–12 (D.N.H. 2009)). The Court finds this standard to be helpful, as it embraces an objective viewpoint and is tailored to match *Davis*'s standard that an appropriate school official must be "deliberately indifferent to known acts of sexual harassment" for a Title IX claim to arise. *Davis*, 526 U.S. at 641. Moreover, this principle allows the Court to reach a decision in this case without concluding whether it will adopt or decline the theory that Title IX of liability is predicated on actual knowledge of a "substantial risk" of sexual harassment. Relying on this principle, the Court denies the District's motion for summary judgment on the Title IX claim: Plaintiffs have presented sufficient evidence to create a triable issue of fact regarding whether the District's officials had actual knowledge that David M. was engaging in behavior towards C.K.M that, viewed objectively, could reasonably be interpreted to constitute sexual harassment.

Plaintiffs' evidence demonstrates that Defendants Siegel, the superintendent of the District, and Maxwell, the District's Executive Director of Special Services, spoke with attorney Coats about David M. when David M. transferred into the District and aware of David M.'s previous instances of sexual harassment. Additionally, the District received David M.'s Evaluation Summary from Clover Park, which alerted the District to his history of sexual harassment and assault. This evidence by itself is insufficient to create a genuine dispute as to whether the District had actual knowledge of David M.'s sexual harassment; rather the evidence may support a claim of constructive knowledge.

But in this case, the District's knowledge of David M's history of sexual harassment was accompanied by reports of David M.'s actions with C.K.M. in the ILC

classroom. Defendant Miller and the ILC paraeducators also kept a logbook of David M.'s inappropriate behavior, which often included documented instances of interactions between David M. and C.K.M. Plaintiffs interpret these interactions to be sexual harassment, while the District characterizes them as David M. simply attempting to get close to C.K.M. Plaintiffs assert that the logbook was shared with the District's leaders and policy makers, which should be interpreted as the District having actual knowledge. On the other hand, Defendant Gifford testified in his deposition that David M.'s actions towards C.K.M. were not sexual harassment but inappropriate behavior because C.K.M. did not object to what was going on. The District also received a written report of the October 5 incident, in which Plaintiffs claim David M. sexually assaulted C.K.M., but the District argues that the October 5 incident did not consist of sexual assault.

The Court may not decide at this stage whether these known acts could objectively be characterized as sexually motivated and whether the District was deliberately indifferent to David M.'s actions towards C.K.M. These are questions of fact for the jury to decide. The Court therefore denies the District's motion as to the Title IX claim.

**C.     Washington Law Against Discrimination Claim**

Defendants additionally move for summary judgment on Plaintiffs' WLAD claim, arguing that C.K.M. has not been discriminated against because of her gender or her disabilities. Plaintiffs bring a WLAD claim against the District for public accommodation discrimination pursuant to RCW 49.60.215. The Washington Supreme Court has recently clarified that "school districts are subject to strict liability for discrimination by their employees in violation of the WLAD in places of public accommodation under RCW

49.60.215." *W.H. v. Olympia Sch. Dist.*, 195 Wn.2d 779, 787 (2020). To make a prima facie public accommodation claim, a plaintiff must show that:

> (1) the plaintiff is a member of a protected class, (2) the defendant's establishment is a place of public accommodation, (3) the defendant discriminated against the plaintiff when it did not treat the plaintiff in a manner comparable to the treatment it provides to persons outside that class, and (4) the plaintiff's protected status was a substantial factor that caused the discrimination.

*Floeting v. Grp. Health Coop.*, 192 Wn.2d 848, 853 (2019) (internal citation omitted).

Washington state courts have held that summary judgment will often be inappropriate in public accommodation cases because the evidence "will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 777 (2011) (quoting *Davis v. W. One Auto. Grp.*, 140 Wn. App. 449, 456 (2007)); *see also Scrivener v. Clark College*, 181 Wn.2d 439, 445 (2014). Summary judgment is appropriate, however, when a plaintiff fails to raise a genuine issue of fact on one or more prima facie elements. *Frisino*, 160 Wn. App. at 777. Here, Plaintiffs assert that they have established a prima facie WLAD claim to preclude summary judgment.

Plaintiffs argue that C.K.M. is part of two protected classes: one because of her disability and one because of her sex. WLAD prohibits discrimination in places of public accommodation because of "the presence of any sensory, mental, or physical disability" and because of sex, *inter alia*. RCW 49.60.215. Additionally, the alleged discrimination occurred at Bethel High School, a public school. WLAD defines a place of public accommodation to include "any public library or educational institution, or schools of

1   special instruction[.]" RCW 49.60.040(2). The plain statutory language of WLAD clearly

2   encompasses public schools like Bethel High School as a place of public accommodation.

3   Therefore, the remaining questions are whether discrimination occurred and whether

4   C.K.M.'s status as a member of a protected class was a substantial factor causing the

5   discrimination.

6          Plaintiffs argue that C.K.M. was discriminated against in two ways: first, when she

7   was sexually harassed and assaulted by David M. and, second, when the District's

8   employees did not apply the District's sexual harassment policy to her.

9          It is undisputed that sexual harassment is a form of sex discrimination under

10  WLAD. *W.H.*, 195 Wn.2d at 792 (quoting *Floeting*, 192 Wn.2d at 853). The Washington

11  Supreme Court has also held that other forms of intentional sexual discrimination,

12  including physical abuse and assault, constitute sex discrimination. *Id.* at 792–93. But

13  Plaintiffs' sex discrimination claim fails because David M.—not the District's

14  employees—was the perpetrator of the sex discrimination.

15         In *Floeting*, the Washington Supreme Court held that an employer is strictly liable

16  for the discriminatory acts of its employees because of how WLAD defines "person." 192

17  Wn.2d at 859–60. WLAD's public accommodation statue prohibits any person from

18  discriminating based on a protected class, RCW 49.60.215, and WLAD's definition of

19  "person" includes any "agent or employee," RCW 49.60.040(19). The Washington

20  Supreme Court therefore interpreted "'any person or the person's agent or employee' to

21  mean something more than that each person is liable for their own actions" and held that

22  employers are liable for the actions of their employees, even when the employer itself is

1   not at fault. *Floeting*, 192 Wn.2d at 860. Yet the Washington Supreme Court made clear

2   that an employer has a defense for public accommodation WLAD claims if "the person

3   who committed the discrimination was not its agent or employee." *Id.* at 261. Such is the

4   case here. While David M.'s actions could constitute sexual harassment and therefore sex

5   discrimination, David M. was not an employee or agent of the District. And Plaintiffs

6   have neither alleged or submitted evidence to establish that David M. was the District's

7   employee or agent. Because no employer-employee or employer-agent relationship has

8   been asserted, let alone established, between the District and David M., Plaintiffs cannot

9   establish that the District discriminated against C.K.M. on the basis of her sex.

10          Plaintiffs also assert that the District discriminated against C.K.M. because it

11   denied C.K.M the protection of the District's sexual harassment policy because of her

12   cognitive disabilities. Defendant Gifford and the Defendant's expert, Janet Barry, both

13   stated that, because C.K.M. did not object to David M.'s actions towards her, their

14   interactions were not sexual harassment. But Plaintiffs argue that C.K.M.'s cognitive

15   disabilities would not allow her to object to David M.'s behavior. Plaintiffs assert that the

16   District's decision not to apply the sexual harassment policy to C.K.M. was

17   discrimination because the District treated C.K.M. differently than the District treats

18   "typically functioning" students with regard to the sexual harassment policy. Dkt. 42 at

19   38. Defendants, on the other hand, argue that C.K.M.'s alleged sex abuse was "at most

20   due to a momentary lapse in supervision" and not because of her disability. Dkt. 39 at 25.

21   Plaintiffs have raised a question of fact as to whether C.K.M. was discriminated against

22   because of her protected status, which is to be determined by the jury.

Plaintiffs have also created a question of fact at this stage as to whether C.K.M.'s protected status as an individual with cognitive disabilities was a substantially motivating factor for the discrimination. "A 'substantial factor' means that the protected characteristic was a significant motivating factor . . . . It does not mean that the protected characteristic was the sole factor in the decision." *Scrivener*, 181 Wn.2d at 444. Plaintiffs have presented evidence by way of their expert that C.K.M.'s inability to object to David M.'s sexual harassment substantially motivated Defendants' discrimination. But Defendants deny that they discriminated against C.K.M. at all on the basis of her cognitive disabilities. It remains a question of fact for the jury to decide whether C.K.M.'s protected status was a substantially motivating factor that caused the alleged discrimination.

The Court therefore grants summary judgment as to Plaintiffs' WLAD sex discrimination claim but denies summary judgment as to Plaintiffs' cognitive disability claim.

**D.      Negligence Claim**

Plaintiffs bring a negligence claim against the District,[2] alleging that the District breached its duty to protect C.K.M. and that it failed to properly train its employees. Under Washington law, "[s]chool districts have the duty to exercise such care as an

---

[2] In their complaint, Plaintiffs articulate that they are bringing a negligence claim against all Defendants. *See* Dkt. 1-2 at 10 ("Negligence – All Defendants"). But in their allegations, Plaintiffs allege only that the District violated its duty of care. *See id.* at ¶¶ 4.1–4.9. The Court therefore assumes that Plaintiffs are only bringing claims against the District and not against the individual Defendants.

1    ordinarily responsible and prudent person would exercise under the same or similar

2    circumstances." *Hendrickson v. Moses Lake Sch. Dist.*, 192 Wn.2d 269, 275 (quoting

3    *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 430 (2016)) (internal quotations omitted). The

4    Washington Supreme Court has described the duty of care as "enhanced," *Christensen v.*

5    *Royal Sch. Dist. No. 160*, 156 Wn.2d 62, 67 (2005), meaning that school districts have a

6    duty to protect their students from foreseeable harm, even when that harm is caused by

7    third parties, *N.L.*, 186 Wn.2d at 429–30. As long as the harm is "reasonably

8    foreseeable," a school district may be liable if it failed to take reasonable steps to prevent

9    that harm. *McLeod v. Grant Cty. Sch. Dist. No. 128*, 42 Wn.2d 316, 320 (1953).

10        Plaintiffs have provided evidence to support its argument that the District

11   breached its duty owed to C.K.M. by failing to protect her from the known threat of

12   David M. The evidence provided shows that the District was aware of David M.'s history

13   of sexual harassment and assault at Clover Park and that the District had taken steps to

14   mitigate any harm by placing David M. on one-on-one supervision. Plaintiffs argue that

15   the breach occurred when the District failed to tell their employees about David M.'s

16   history of past sexual assaults and removed him from one-on-one supervision, which

17   culminated in the October 5 assault. The District refutes this assertion and argues that it is

18   entitled to summary judgment because it has no duty to constantly supervise students.

19   Dkt. 39 at 26. But to support this argument, the District provides case law from Vermont,

20   Louisiana, and California state courts. *See id.* The District has not provided binding

21   precedent that it did not breach the duty to protect from reasonably foreseeable harms to

22   establish its right to judgment as a matter of law on Plaintiffs' failure to protect claim.

1    But to the extent that Plaintiffs are bringing an independent negligence claim for

2    the District's negligent training and supervision of its employees, the District is entitled

3    to summary judgment. An employer may be liable for negligently training or supervising

4    an employee. *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 51 (1997). But an action

5    based on negligent training and supervision "is applicable *only* when the [employee] is

6    acting outside the scope of his employment." *Anderson v. Soap Lake Sch. Dist.*, 191

7    Wn.2d 343, 361 (2018) (quoting Restatement (Second) of Torts § 317 cmt. a) (emphasis

8    and alteration in original). An employer may be held vicariously liable for its employee's

9    torts committed within the scope of employment under the theory of respondeat

10   superior—not a negligent training and supervision claim. *See Robel v. Roundup Corp.*

11   148 Wn.2d 35, 53 (2002). Because Plaintiffs have not alleged or provided evidence on

12   any District employee's actions occurring outside the scope of their employment, the

13   District has established the right to judgment as a matter of law for a negligent training

14   and supervision claim.

15   The District raises for the first time in its reply the issues of proximate cause and

16   damages and argues that Plaintiffs cannot establish that any alleged breach caused injury

17   to C.K.M. because of her severe cognitive disabilities. Dkt. 46 at 25. It is improper to

18   present an argument for the first time in a reply. The Court therefore grants summary

19   judgment to the extent that Plaintiffs are bringing an independent claim for negligent

20   training and supervision and requests supplemental briefing on the issue of proximate

21   cause and damages for negligent failure to protect.

22

**E.    Plaintiffs L.K.M. and J.M.'s Individual Claims**

Finally, Plaintiffs L.K.M. and J.M. request damages pursuant to RCW 4.24.010, which allows a parent to recover damages for the injury of their child. Dkt. 1-2, ¶ 5.1. "However, RCW 4.24.010 neither includes nor expressly incorporates a statute of limitations." *Fast v. Kennewick Pub. Hosp. Dist.*, 187 Wn.2d 27, 33 (2016). Defendants assert that L.K.M. and J.M.'s claim under this statute is time barred pursuant to RCW 4.16.080(2). Dkt. 39 at 28. Plaintiffs, on the other hand, argue that their claim is ancillary to C.K.M.'s claim for negligence and was timely filed as extended by the minor tolling provision of RCW 4.16.190. Dkt. 42 at 43. It is unclear to the Court what statute of limitations is applicable to L.K.M. and J.M.'s individual claims here in the absence of an explicit directive from the state statute.

Defendants also argue that L.K.M. and J.M. cannot state individual claims under Title IX and § 1983 as C.K.M.'s parents. *See* Dkt. 39 at 29. L.K.M. and J.M. do not refute that they cannot sustain an individual claim under Title IX and argue that their § 1983 claim is not time barred under the rules of equitable tolling. Dkt. 42 at 44. But L.K.M. and J.M. do not engage in whether they are bringing their own § 1983 claim for their own constitutional violations or whether their § 1983 claims are derivative of C.K.M.'s § 1983 claim.

The Court therefore reserves ruling on Defendants' motion for summary judgment on L.K.M. and J.M.'s individual claims and requests supplemental briefing on the applicable statute of limitations and the Plaintiff parents' § 1983 claim.

# IV.  ORDER

Therefore, it is hereby **ORDERED** that Defendants' motion for summary judgment, Dkt. 39, is **GRANTED** in part and **DENIED** in part and that the Court reserves ruling in part.

Plaintiffs may file supplemental briefing on the issues of clearly established due process rights and *Monell* liability for Plaintiffs' § 1983 claim, proximate cause and damages for Plaintiffs' negligence claim, the applicable statute of limitations for L.K.M. and J.M.'s individual claim, and L.K.M. and J.M.'s individual § 1983 claim no later than December 30, 2020. Defendants may respond no later than January 8, 2021. The Clerk shall renote Defendants' motion for summary judgment, Dkt. 39, for the Court's January 8, 2021 calendar.

Dated this 3rd day of December, 2020.

BENJAMIN H. SETTLE
United States District Judge